IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 11, 2001 Session

## STATE OF TENNESSEE v. EARL T. JEFFERSON

**Direct Appeal from the Criminal Court for Shelby County
No. 98-06754     Joseph B. Dailey, Judge**

_____

**No. W2000-00608-CCA-R3-CD  - Filed June 12, 2001**

_____

The defendant was convicted by a Shelby County jury of premeditated first degree murder and sentenced to life imprisonment without the possibility of parole. In this appeal, the defendant challenges the admission of three alleged hearsay statements and the sufficiency of the evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

A. C. Wharton, Jr., Shelby County Public Defender; Michael J. Johnson (at trial), Nelle W. Pallme (at trial), and Tony N. Brayton (on appeal), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Earl T. Jefferson.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and James M. Lammey, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant appeals his premeditated first degree murder conviction challenging the admissibility of three alleged hearsay statements and the sufficiency of the evidence. We conclude that one of the three challenged statements was erroneously admitted into evidence; however, we further conclude its admission was harmless. Since we also find the evidence to be sufficient to support the conviction, the judgment of the trial court is affirmed.

# FACTS

Erica Brown was the defendant's cousin, and the defendant stayed at her residence from time to time. On July 23, 1997, Brown and her three-year-old daughter were patronizing Comfort Laundry. At approximately 9:45 p.m., the victim, Charles Cook, who lived primarily in his vehicle which was often parked in close proximity to the laundry, entered the laundry. The victim proceeded to Christy White, an employee of the laundry, and requested change for $1.00 in order to purchase a beverage. White provided the victim with change, and he walked toward the vending machine. Before reaching the machine, he stopped and inquired of Brown if he could purchase a drink for her daughter. Brown granted the victim's request, and the victim purchased and delivered a grape soda to Brown's daughter. The victim momentarily talked with the girl, then he exited the building.

White testified that a couple of minutes after the victim exited the laundry, Brown ran to the counter and stated, "Did you see what that guy did?" White further testified that Brown said

> [the victim] was down bending on his knees outside the door, the door cracked open, of the laundromat and he was beckoning for her child to come toward him; and when she turned around and saw her little girl walking toward the door and saw him at the door, he backed away.

White testified that this incident made Brown upset. Brown further stated to White, "[h]e don't [sic] know what he's doing. He's messed up now. I need to make some phone calls." After Brown used the telephone, she warned White, "[d]on't stick your head out the door about 10:30. We're going to come back through spraying." White further testified that her [White's] husband went to the nearby Church's Chicken parking lot, where the victim was located, and told him to never again reenter the laundry.

Yarico Butler, a former girlfriend of the defendant, testified that she talked with him on the phone concerning his involvement in the murder. She stated that the defendant requested she pick him up because he was in "trouble." The defendant then told her that Erica Brown, the defendant's cousin, came home and informed him of the incident at the laundry and demanded "something [be] done" to the victim. Brown then drove him and an acquaintance to the laundry and waited in the car while they shot the victim. On cross-examination, Butler conceded that she and Erica Brown were having "problems" with each other when the incident occurred, and Butler pled guilty to a charge of harassment of Brown.

Junea Payton, a nurse, testified that on July 23, 1997, she was driving home from work with her mother and saw the victim attempt to flee from two men and fall in the center of Airways Boulevard. She then saw his two assailants kick him while he was on the street. The victim picked himself up and crossed the street. Payton heard a shot, so she turned her vehicle around and proceeded to the victim. By the time Payton returned, the two men were standing over the victim kicking him. She also observed one of the men shoot the victim while the victim was on his side. Payton was unable to positively identify the two men, but testified they had thin builds, and one was

approximately 18, while the other was approximately 25. She testified that the younger man actually did the shooting.[1] The two men fled, and she and her mother administered CPR on the victim. The victim died at the scene from a gunshot wound.

Alvin Peppers, of the Memphis Police Department Crime Scene Unit, testified that when he arrived on the scene, the victim's vehicle was running. He further testified that the victim was found at the scene in possession of $258.65.

James Holder, a latent fingerprint examiner with the Memphis Police Department, testified that a palm print lifted from the victim's vehicle matched the defendant's palm print.

The defense offered the testimony of the defendant's grandmother, Juanita Jefferson, who testified that Yarico Butler phoned her from jail and stated that the defendant killed someone. Butler then stated, "[h]e going [sic] to pay for what he done [sic] to me . . . [h]e left me alone." Butler further stated that she and Erica Brown got in a fight, and "it had a whole lot to do with Earl [defendant]." Jefferson further testified that after she advised Butler to "straighten this stuff out" with the defendant, Butler replied, "[n]o, I'm going to hurt both of them anyway I can. I don't care. I'm going to get my revenge."

## I. WITNESS TESTIMONY

Erica Brown did not testify at the defendant's trial. The defendant challenges the admissibility of the following three statements made by Brown, which were introduced through the testimony of Comfort Laundry employee Christy White:

(1) [the victim] was down bending on his knees outside the door, the door cracked open, of the laundromat and he was beckoning for her child to come toward him; and when she turned around and saw her little girl walking toward the door and saw him at the door, he backed away;

. . . .

(2) [h]e don't [sic] know what he's doing. He's messed up now. I need to make some phone calls; and

. . . .

(3) [d]on't stick your head out the door about 10:30. We're going to come back through spraying.

---

[1] According to the judgment, the defendant was born on December 12, 1975, making him 21 years of age at the time of the offense.

The trial court allowed all three statements holding they were relevant, non-hearsay because they showed motive and were not offered for the truth, and if hearsay, admissible under the excited utterance exception. Defense counsel also claimed the prejudicial effect of the testimony substantially outweighed any probative value. The trial court rejected this ground, finding the testimony was highly probative and outweighed any prejudicial effect. We shall address each statement in the order they were uttered.

## A. First Statement

The trial court properly held that the first statement was non-hearsay. Hearsay constitutes "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c); State v. Belser, 945 S.W.2d 776, 784 (Tenn. Crim. App. 1996). The first statement was not offered to prove that the victim was, in fact, attempting to lure Brown's child out of the laundromat. As the trial court found, it was admissible to show that "[Brown] felt that he had," thus showing why Brown took action. Furthermore, this relevant testimony was not unfairly prejudicial to the defendant.

## B. Second Statement

The trial court properly admitted the second statement. The first two portions of the second statement are "[h]e don't [sic] know what he's doing," and "[h]e's messed up now." These two assertions were not hearsay since they were not admitted to prove that the victim was unaware of the consequences of his actions or that he, in fact, did "mess up." The final portion of Brown's second statement was "I need to make some phone calls." We conclude it was offered to prove the truth of the matter asserted; namely, that Brown intended to call some person or persons to get assistance. Accordingly, this portion of her second statement was improperly admitted, unless it fell within a hearsay exception. *See* Tenn. R. Evid. 802.

The rules of evidence provide for an excited utterance exception to the hearsay rule; namely, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The following criteria must be proven for a statement to be admitted under the excited utterance exception:

(1) there must be a startling event or condition that causes the stress of excitement;

(2) the statement must relate to the startling event or condition; and

(3) the statement must be made while the declarant was under the stress of excitement from the event or condition.

State v Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).

We can think of few greater startling events than a parent's perception that her young daughter was almost kidnapped or molested. Accordingly, we conclude the first element was proven. When read in context, Brown's statement that she needed to make phone calls obviously related to the startling event. Accordingly, the second element was proven. White testified that Brown "came running" to her, which occurred immediately prior to this statement. Furthermore, she testified that Brown "was upset" when she made the statement. The statement was made while Brown was under the stress of excitement of the event; thus, the third element was sufficiently established. The trial court properly admitted this statement under the excited utterance exception to the hearsay rule.

Furthermore, we conclude that this testimony was relevant because it shows that Brown, by making phone calls, intended to take action against the victim. This, in turn, makes it "more probable" that Brown returned with someone else. *See*. Tenn. R. Evid. 401. Therefore, whether or not the defendant was the person actually called is not determinative of its admissibility. Other evidence, including the defendant's admission to Butler, indicated that it was the defendant who returned with Brown. This testimony was not unfairly prejudicial to the defendant.

## C. Third Statement

The third statement was a warning by Erica Brown to Christy White, after Brown made a phone call or calls, that she should not "stick [her] head out the door about 10:30. We're going to come back through spraying." This statement was offered for its truth; namely, that Brown and another or others would be coming back and shooting. Accordingly, the statement was hearsay and inadmissible unless it fell within a hearsay exception. *See* Tenn. R. Evid. 802.

The prosecutor asked White the following question: "Okay. Do you recall if she [Brown] came back to the scene, yourself; or did she say – indicate that she would?" White responded that Brown warned her they would come "through spraying." There was no testimony concerning the length of time that elapsed during Brown's phone call or calls, nor was there testimony concerning her demeanor when she made the statement. Although it may have been a very short time, we are unable to speculate. Accordingly, the state failed to establish the proper foundation for the excited utterance exception to apply.

The state additionally argued at trial and on appeal that this testimony was admissible under the co-conspirator exception. The rules of evidence except from the general prohibition against hearsay testimony "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." Tenn. R. Evid. 803(1.2)(E). However, there was no testimony concerning the identity of the person or persons whom Brown called. The testimony of Yarico Butler, another state witness, indicated that the defendant was informed of the incident by Brown when Brown returned home. Accordingly, the state failed to establish that a conspiracy existed at the time this statement was made.

It is arguable that this third statement is admissible under the state of mind exception to the hearsay rule, which is "[a] statement of the declarant's then existing state of mind . . . (such as intent . . .)..." Tenn. R. Evid. 803(3). If so, the statement could only be used to establish Brown's "intent" to return with someone else, and not that the defendant acted in accordance with Brown's statement of intent. Tenn. R. Evid. 803(3), Advisory Commission Comments; N. Cohen *et al.,* **Tennessee Law of Evidence** § 8.08 [5][c] (4th ed. 2000). However, the state did not argue this exception at trial or on appeal. Thus, we decline to address whether this statement was admissible under the state of mind exception to the hearsay rule.

Regardless, we conclude the admission of this third statement to be harmless error at most. The identity of the person or persons whom Brown phoned was never established. The testimony concerning the defendant's involvement in the shooting was properly admitted through Yarico Butler, who testified that the defendant told her that he and an accomplice shot the victim while Brown waited in the getaway car. Additionally, the defendant's palm print was found on the victim's vehicle, which was still running when officers arrived at the scene. We, therefore, conclude that the admission of the third statement did not affect the conviction. *See* Tenn. R. App. P. 36(b).


## II.  SUFFICIENCY OF THE EVIDENCE

The defendant alleges the evidence was insufficient to sustain his conviction. More specifically, he contends the evidence does not sufficiently establish that he was the perpetrator of this homicide. We disagree.

### A.  Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App.1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is

insufficient to support the verdict returned by the trier of fact. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982); <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1973).

## B. Analysis

The testimony established the victim was shot within a short distance of his vehicle, which was still running when officers arrived. The defendant's palm print was found on the victim's vehicle. Junea Payton witnessed the shooting and, although she was unable to view the face of either assailant, the defendant fit the general physical description of one of them. Furthermore, Yarico Butler, the defendant's former girlfriend, testified that the defendant confessed involvement in the crime. Although the defendant attacked the credibility of Butler, it was within the jury's province to determine credibility. <u>State v. Oody</u>, 823 S.W.2d 554, 558 (Tenn. Crim. App.1991) (the credibility of the witnesses is entrusted to the sound discretion of the jury as the trier of fact). The evidence was more than sufficient to support the conviction.

## CONCLUSION

Based upon our review of the record, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE